Let's wait and let let's wait till everyone gets settled. Okay, Ms. Felder. Thank you, Your Honor. May it please the Court, Julie Vaughn Felder here on behalf of Resa Latiolais. The Constitution affords all parties the right to a fair and impartial trial before a jury of their peers. In this particular case, a jury is the only place my client felt she could receive justice, since her cause of action was rooted in a conspiracy claim that involved police officers, political officials, and police agencies. The very people who owed a societal obligation to protect Resa Latiolais were found to be working hand-in-glove with Brad Griffith to deprive her of her constitutional right to the care, custody, and control of her minor child. That was proven both at the custody trial as well as in this civil suit. Liability is not at issue. This jury found that Brad Griffith and Officer Rolos Gallo conspired to deprive Latiolais of her constitutional right to the care, custody, and control of her son. And although the Constitution affords her a right to a fair and impartial trial, Ms. Latiolais was deprived of that right. This was based in large part on two critical errors made by the trial court and three additional errors by the jury. The first error that was committed by the trial court was when the judge ruled that the settlement be disclosed to the jury. The second error that deprived our client of a right to a fair trial was when he granted Donald Craven's directed verdict. The jury never got to decide that issue. And the jury made three errors based largely on confusion. They were confused on the damages issue since the settlement had been revealed. And they were also confused about the color of state law issue and vicarious liability based on Ms. Williams, the city attorney's, misstating the law in her closing argument. With regard to the settlement disclosure, Article 408 is clear. Generally speaking, settlements and compromises are not disclosed for purposes of proven liability or infidelity of claims, with a few exceptions. The exceptions enumerated in Article 408B clearly don't apply to this case. There was no evidence of witness bias or prejudice. It was not used to negate a contention of undue delay. And it was certainly not used to prove an effort to obstruct a criminal investigation or prosecution. And although the Court may admit settlement as evidence for other purposes, such as in the case to avoid jury confusion, like in the Kenning case, that was not the case here. This case is, first of all, distinguishable from Kenning, mainly because in the Kenning v. Stripes and Lamartase, the jury had heard opening arguments and testimony prior to one of the defendants settling. He settled in the middle of trial. I could see where that would add to the confusion. But certainly, Brad Griffin settled prior. So why was the settlement agreement admitted? According to the judge's comments, on five different occasions, it was because the judge said the jury had a right to know. He said on five different occasions, the jury has a right to know. According to the record, his primary reason that he allowed the settlement of Griffith to be disclosed was because the judge thought it was, quote, the right thing to do. It was rooted in fairness and what he considered right. But my question to this Court is, it was fair to whom? Certainly not to the plaintiff, because clearly the disclosure of the settlement prejudiced her as evidenced by the amount of damages that were awarded. But even if this Court were to find that a settlement should be disclosed pursuant to Article 408, I suggested this Court that under Article 403, there's still a duty to balance the prejudicial value of the probative value against the prejudicial effect. And clearly, the prejudice in disclosing the settlement to this jury outweighed that effect. You know, of course, how seldom it is that we find abuse of discretion on a simple evidentiary issue such as this. Absolutely, Your Honor. I understand. But when you look at the calculations of damages here, when you see that they found Brad Griffin was at fault and committed a conspiracy to deprive Risa LaChalet of care, custody, and control of her child, and then found that Officer Rolas Gallo was involved in that conspiracy, then it's counterintuitive that they would award damages in the amount of $10,647 when just her legal fees alone associated with the custody trial were in excess of $69,000. This is not a dollar for pain and suffering. So if we were to accept your argument, would you want this jury's verdict overturned, the amount? Absolutely, Your Honor. I would — Would it start all over again? Unfortunately, I don't think that's all we're left with. I know in State courts, the appellate courts are allowed to review and render, but my impression of the law here is that is our only remedy, is that we would have to retry the case and that the settlement would not be able to be disclosed. And the jury's verdict is set aside? Correct, Your Honor. How about the rulings regarding Senator or Mayor Cravens? With regard to the directed verdict of Senator Mayor Cravens, at the time, Senator, when the action occurred, Mayor, when the testimony at trial came, when you look at the testimony of Brad Griffin, Senator Cravens, Officer Montgomery, and Jan Huffman, there is nothing consistent within their testimony. When you look, Brad — first of all, Brad Griffin denied ever calling Senator Cravens. He said that he spoke to his office staff and told them he felt he was treated unfairly. Now, it's not believable, quite obviously, that he would forget he called a senator and asked him to contact a detective regarding a custody suit, but that's what he testified. Donald Cravens testified that Brad called him more than once and that even perhaps came to see him, and said that he finally called Officer Montgomery because he was, quote, tired, end quote, of being asked by Griffin, and because he had promised him he would call. Donald Cravens testified the only thing he ever asked of Detective Montgomery was for him to be fair and look at the evidence. But when he answered in his derogatories prior to the custody — I mean, prior to the custody, he testified that it was his understanding that LaChalet had used her friendships with individuals in law enforcement to unduly influence the investigation into her alleged abuse of Cole Griffin, including a possible circumvention of a court order, and that Mr. Cravens talked with Mr. Montgomery about whether Mr. Montgomery was in charge of the investigation of the alleged abuse and addressed Mr. Griffin's concerns, that Ms. LaChalet's political and social connections would play a role in the outcome of this investigation. Now, when he was asked at trial, he denied knowing her name. And then when he was asked why in his answers to interrogatories would he have said that he was aware she had, quote, political and social connections that would affect the outcome of the trial, he said, I never said that. My attorney drafted that without consulting with me. Well, again, it's difficult to believe that his attorney, given the detail of this answer, would have drafted that response without any input from his client. Now, Donald Cravens testified he couldn't recall whether he told one of the co-conspirators, Jan Huffman, to secure a restraining order against Ms. LaChalet. He wouldn't deny it, but he couldn't recall it. Jan Huffman testified at the custody trial that it was Senator Cravens and his brother who advised her to get a restraining order against Risa LaChalet. But at trial, she said that she never used his name, despite the prior testimony. And when the trial court granted the directed verdict, the judge stated the evidence did not support keeping Donald Cravens in the case. And he also said that Officer Montgomery was never impeached. But he was impeached, three times. He gave three stories. One, when he testified at the custody case in 2008, and he changed his story depending on what Mr. Felder would ask him or Mr. Cravens, which was Donald Cravens' brother who was acting his attorney, or the judge. In 2008, he clearly said that Cravens called him and said, quote, there was an ongoing child custody thing, whatever, between Brad and Risa, and could I help Brad if I could? Now, Montgomery testified at the custody trial that Senator Cravens contacted him after he had closed his criminal investigation. Recall, he had to open it again because Brad had influence even with the sheriff's department. He reopened up the allegations of abuse and closed it. But Montgomery testifies he was contacted by Senator Cravens after his criminal investigation was closed, and that he — that Senator Cravens was aware that he was going to be a witness in the upcoming custody trial. And Officer Montgomery in 2008 said he was angered by the call because he was a professional, and things were black and white to him, no matter who he was investigating. But shortly before the trial, Officer Montgomery was contacted by Donald Cravens' brother, who was representing him, and asked him to execute an affidavit. And that clearly contradicted his prior testimony in the custody case. And although he admitted to his testimony in 2008 and even testified that his memory would have been better then, given the fact he had been involved in a head-on collision and suffered memory loss, on direct, he admitted that Donald Cravens asked him to help Brad out. But he clarified by saying he understood this to just be a figure of speech, that he understood what Cravens said to be a figure of speech. But on cross, when Mr. Cravens asked him about the term help Brad out, he said, isn't it true that you used those words as a figure of speech? And Officer Montgomery says, yes. And then when Cravens crossed him, but and on direct, he admits that as a result of Senator Cravens calling him, that he calls his supervisor as a result. But when Cravens crosses him, the first question that comes out is, if you thought the phone call by Senator Cravens was improper, isn't it true you would have contacted your supervisor, but you didn't? He says, correct. Now, 10 minutes before, he had testified he had, correct, contacted his supervisor. Now, when the judge questions him, which is particularly instant and interesting, he asked, if you felt like the phone call was improper, you would have reported it to your supervisor in internal affairs, correct? And he says, correct, I would have. He said, but you did. The judge, like, reminds him, you did contact the supervisor. And then he explains, well, I only did that. So if I was being taped by Senator Cravens, it wouldn't appear that there was influence or corruption. Now, I would say to this court, how could there ever be an influence or corruption allegation if all the phone calls said from Cravens to Montgomery was, be fair, look at the evidence? Why would he have been concerned about that being taped? It's not consistent. Detective Montgomery testified that Donald Cravens didn't know about the — did not know about the custody litigation, although on direct he admitted he did. And while he — and he was impeached with his prior testimony and admitted, yes, that's what I said in 2008. Now, what's interesting to me is that the judge's questions of Officer Montgomery focused on what, quote, if I could, end quote, meant. And the reason that's important is because despite Officer Montgomery and Mr. Cravens' suggestion that when he said he was asked to help Brad out, it was a figure of speech, clearly the trial court didn't think it was a figure of speech, because he says the most critical question I have for you is, what does, quote, if you could mean? Now, there was no response to that question. Officer Montgomery testified that the politicians put pressure on him as well as his own office. It's just not believable. With regard to vicarious liability in color of State law, the law was misquoted. He was in uniform, issued a citation, appeared in two criminal courts. I would say as much as the word fair was used by this Court, by the trial court, by Cravens, by Montgomery, my client has a right to a fair trial.  You've saved time for rebuttal, Ms. Shelby. Thank you. Mr. Cravens. May it please the Court, Charles Cravens, Special Assistant Attorney General, on behalf of Defendant Donald Cravens, Sr. If what the plaintiff alleges is true, then there was some serious injustice done. And to remove all the sugarcoating and to be plain and direct, the plaintiff accuses Donald Cravens, Sr. of calling Officer Alex Montgomery and asking Officer Montgomery, Deputy Montgomery, to commit perjury in a custody trial. When Donald Cravens first found out about this allegation, which was several years after the phone call, he was incredulous. And the form in which Montgomery's statements were presented in the filings in the district court in Lafayette led Cravens to believe that Montgomery had simply fabricated a story about what had occurred during their phone conversation. And he was, Cravens was, understandably upset. Is this in the record? Let me. Yes, Your Honor, in Cravens' testimony, Cravens testified to this at trial. At, this went on for several years until Officer Montgomery was asked in preparation for trial to clarify his statements made at the custody trial. Now, during this time, Cravens and Montgomery used the words custody dispute, custody case interchangeably, but they were not talking about civil, a civil custody trial. They were talking about a custody dispute that started in 2005 around the time of Hurricane Rita. This, what simply happened is this, as is reflected in the record. Donald Cravens called, first Brad Griffith complained to Donald Cravens about his, about being treated unfairly. Cravens believes that there were a couple of calls. So he finally contacted Deputy Montgomery and asked Deputy Montgomery to be fair. Deputy Montgomery, there was a very brief conversation and Deputy Montgomery took no action regarding the case as a result of Cravens' request. There is no evidence at all in the record that Cravens was asked by Brad Griffith to do anything improper. Montgomery was very clear in his memory, not of his testimony, but he was clear in his memory of his interaction with Cravens. Both Cravens and Montgomery, the only two people who had knowledge of the conversation between Cravens and Montgomery, both testified that there was nothing improper that was requested during that conversation. What did Montgomery say about the conversation? He said that Cravens asked him to be fair. Did he say to help Griffith out? I think that Montgomery said that Cravens used the words, help him out. I think he did say that, if he could. But Montgomery didn't get the impression that Cravens was asking him to do anything wrong. And Montgomery said that he got these kinds of calls all the time, with people asking him to look at things with plain sight. But why the — I guess the issue is, why wouldn't that be something that the jury should be evaluating as to the meaning and interpretation of what was said? Because there was no contradiction — there was no contradiction as to what the purpose of the call was from anyone. A lot of what's presented here — for instance, the discussion about Jan Huffman, and counsel said her brother actually was — I mean, Cravens' brother actually was Cravens' son, who spoke to Jan Huffman, she testified. And Huffman clearly said that she didn't even tell Cravens what Latchley's name was. She said there was a woman who was harassing her, and asked Cravens and his son, who's an attorney, what she should do. And he said, well, you should get a restraining order. And that's used here to imply that there was some nefarious purpose for that. And it was simply some advice to a constituent without knowing exactly who all the parties were. Many things here are misconstrued, misrepresented. And after a three-day trial, the plaintiff had 41 witnesses on their list. They called 19 witnesses. None of those witnesses came forward and said Donald Cravens had done anything wrong. And the overwhelming weight of the evidence showed that there was really nothing there. There was no there there. You know, as the judge said, there's no way on God's green earth that a jury could have reasonably determined that Don Cravens did something wrong. There was no request to perform an illegal act. They never talked about a custody trial. When the plaintiff says that Montgomery knew that or said that he thought that Cravens knew that there was a trial, Montgomery was talking about his subjective interpretation, which he actually no longer believed to be true. In retrospect, he said that's probably not true. He had no reason to know whether Cravens knew anything about a trial. They didn't talk about any trial. Montgomery's affidavit in the briefs indicate that several of the allegations in Montgomery's allegation were proven to be false. That is not true. That's nowhere in the record. Montgomery went over each of his allegations with the attorney for the plaintiff, and he reaffirmed each of those assertions from his affidavit. He underwent questioning from the judge, and the judge was trying to get at the truth. And it was clear that Montgomery said he didn't want me to do anything wrong.  So, after years of litigation, Deputy Montgomery submitted an affidavit asking that or asserting that he wanted to explain his testimony. He was unaware that his testimony had been misconstrued. After that affidavit was obtained, a motion to dismiss was filed. That motion was denied. Judge Hike wanted this to go to trial so everyone would have their day in court. At the end of three days, after all the testimony was heard, it was clear that Donald Cravens was not involved in a conspiracy, that Cravens did not ask anyone to do anything wrong. And because of — if the jury had found, due to argument, because they were urged to consider the questions asked by the attorneys as evidence, and if they had found that Cravens had indeed engaged in a conspiracy, it would have been a travesty. And the judge properly took that away from the jury. Now, there was some testimony that Montgomery got angered because — from the call from Mr. Cravens. Yes. Yes, Your Honor. And he — Montgomery spent a great deal of time explaining that, explaining exactly what that was, that he was angry because Griffith was calling everybody and telling everybody that he was being treated unfairly. And there was even testimony from some other deputies who said the same thing. Griffith was calling everybody and saying that he was being treated unfairly. But when you have a state senator who's called by a constituent and says, I'm being treated unfairly, it is not an illegal act for that senator to call and say, treat him fairly. And that's all the evidence we have here. As Judge Hite pointed out, the only — all we have other than that is innuendo, speculation, inference. And we understand that conspiracies can be proven by circumstantial evidence. But what we have here is not circumstantial evidence. It is innuendo. All right. Your time has expired, Mr. Cravens. Thank you. Thank you. Ms. Williams-Lozan. May it please the Court, my name is Desiree Williams-Lozan, here on behalf of the City of Opelousas this morning. With regard to plaintiff's vicarious liability allegation, I'd like to first reiterate and reemphasize to the Court that this state law claim is the only claim that the jury considered with regard to the City of Opelousas, as all the plaintiff's federal claims had been disposed of and dismissed prior to trial. That said, the plaintiff relies on several factors to cast liability on the City, including the fact that Gallo was in uniform when he cited the plaintiff for a battery. What the plaintiff glosses over, however, is the fact that Ms. Lachele readily admitted to committing a battery in front of Officer Gallo at Opelousas General Hospital. So the vicarious liability theory in that context fails. Further, any actions by Gallo which the jury deemed to be part of a conspiracy against the plaintiff would have constituted personal pursuits on behalf of Gallo which were outside of the scope of his duties as an Opelousas police officer. In Doe v. Louisiana Municipal Association, the Louisiana Fifth Circuit held that such purely personal considerations entirely extraneous to the employer's interests do not give rise to vicarious liability. Similarly, in the City of Green Cove Springs v. Donaldson, this court held that although the scope of employment is considerably broader than explicitly authorized acts of the employee, it does not extend to cases in which the employee has stepped aside from his employment to commit a tort which the employer neither directed in fact nor could be supposed from the nature of his employment to have authorized or expected the employee to do. If Gallo, Officer Gallo, did engage in any conspiracy, it certainly was not something that the City of Opelousas would have directed or even expected him to do, specifically the conduct that was alleged of him at trial. And with regard to plaintiff counsel's assertion that the law on vicarious liability was misstated in my closing arguments at trial, I would just submit that I did not misstate the law. The judge instructed the jury prior to them, prior to turning the case over to the jury. They heard the law on vicarious liability. What counsel for the City did was state her theory of the case, which ultimately was the same. Was there any objection registered? There was no objection, Your Honor. No objection whatsoever. And that theory was ultimately accepted by the jury. The jury was not confused in this case at all. The jury was able to separate Officer Gallo's post, status, or uniform from the alleged wrongful conduct, which would have had nothing to do with the City. With that, Your Honor, I ask that the jury's verdict with respect to the City of Opelousas be affirmed. Thank you, Ms. Williams. Thank you. Ms. Felder, you've saved time for rebuttal. Thank you, Your Honor. With regard to the question of Mr. Cravens, was there anything in the transcript that said that Senator Cravens felt incredulous? Absolutely none. No conversation about that at all and how he felt. With regard to him saying all Senator Cravens did is ask Officer Montgomery to be fair about what, the criminal investigation was closed, this does not make sense. There is no doubt that when Detective Montgomery was asked in 2008, his testimony was, Cravens contacted me, advised me of the custody issues between Brad and Risa, and asked if I could help him out if I could. That's what he said. And when asked, how did you respond, his response was, it made me angry because I am a professional. Things are black and white. I don't care who I'm investigating. That's what was said. Now, he tried to retract and kind of crawfish back from that when he was under cross, but he admitted at the end what I said in 2008 was more accurate as my memory then was better. In fact, Your Honor, I had a head-on collision, and I can't remember a lot. So I would say that if he can't remember a lot, then the specifics for which they claim he can remember now certainly doubts or puts question. When he — I know your argument could be a jury question, but couldn't it be that he was upset because he was asked to be fair, and as an officer, police officer, he was insulted that someone might insinuate he was not being fair? Certainly, that could be one thing that could have made him angry, but that's not what he said. That's not what he said in 2008. When they said that the affidavit he prepared didn't contradict itself, it absolutely did. He signed an affidavit saying he and Senator Cravens never discussed a criminal or civil suit regarding Brad Orisa. Well, clearly that's not true. Officer Montgomery testified previously he was contacted specifically in regard to the custody suit and that the criminal investigation was over. And he also said that juvenile matters are private and generally not open to the public. And so for Senator Cravens to even know about it, he would have to have known about the criminal suit and the custody suit to even make the contact. There's also, there's said in the brief that Brad Griffith is a constituent of Senator Cravens. That's simply not true. He's not one of his constituents. Now, he donated $1,000 to his campaign, but he wasn't his constituent. He worked on the Mayor's Gala with him, but he wasn't his constituent. I think the most important part when you look at the testimony of Brad Griffith, Senator Cravens, Jan Huffman, and Officer Montgomery is they don't add up. Their stories continue to evolve and change. And for a phone call that, according to Senator Cravens, was very short and very brief, there were no explanations as to what that meant or said or what he understood it to say. And Ms. Williams said that the judge gave them the law with regard to vicarious liability. Well, the judge read 20 pages of jury instructions that took about 30 minutes. Midway through, half the jury fell asleep. And within there, yes, there was a discussion of vicarious liability. But I would suggest to this Court that it probably at that point sounded much like Charlie Brown's teachers to them. The word fair, as used by the judge in why he revealed the settlement to the jury, Cravens testified he's asked Montgomery to beef only the verdict. Kennedy, how did the settlement prejudice the verdict? Because when they made their determination when it came to fault, the first question was, was Brad Griffin involved in the conspiracy to deprive a constitutional right of Reese Lauchley? Yes. The second question was, was Rolos Gallo involved? Yes. When we got to the damages section, clearly, if you evaluate the damages of a woman who's been falsely arrested, accused of six criminal offenses in six weeks, had custody taken for two and a half years, and had to litigate this case to the appellate court, the Supreme Court, back to the appellate court, her cost exceeded $70,000. That's not paid in suffrage. Evidence of the settlement affected the amount of the verdict. Absolutely, Your Honors. And I think there's no other way to look at the damage award. It is clear from the $10,647 damage award that they only added up the criminal attorney that she had to use in response to the setup that Officer Gallo did at the hospital of Opelousas. That's all they gave her for, is the criminal attorneys related to that one setup. Well, the conspiracy is the whole thing. It's everything. And the judge continued to say that the attorney was not involved in the case. Thank you, Ms. Felder. Thank you. Your time has expired. Your case and both of today's cases are under submission, and the Court is in recess until 9 o'clock.